In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-22-00269-CR
_____

LUIS TORRES, Appellant

V.

THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court
Jefferson County, Texas
Trial Cause No. 20-35846**

**MEMORANDUM OPINION**

On August 9, 2020, at approximately 2:25 a.m. in the morning, Beaumont Police Officer Gabriel Fells and his partner, Officer Sheena Yarbrough, were traveling in their patrol vehicle northbound on Highway 69. Officer Fells was driving, and Officer Yarborough was riding in the front passenger seat. The officers were traveling back to the police station near the end of their shift, when their police vehicle collided with a vehicle driven by Appellant Luis Torres. Torres was driving on the wrong side of Highway 69—a divided highway—and the accident occurred

1

in an area where the highway is four-lanes with two lanes on each side of a grassy median. The evidence at trial showed that Torres (who was eighteen at the time of the accident) did not have a driver's license, he had been drinking alcohol that evening, and he had attended one or more parties where alcohol was being served. Torres's blood alcohol level after the accident was .209. A grand jury indicted Torres for intoxication manslaughter of a peace officer, and the indictment as amended alleged that Torres's vehicle "was a deadly weapon that in the manner of its use and intended use was capable of causing serious bodily injury and death[.]" *See* Tex. Penal Code Ann. 49.09.[1] Torres pleaded "not guilty," but the jury found him guilty as charged in the indictment. After a hearing on punishment, the jury assessed punishment at twenty years of confinement. On appeal, Torres lists five issues challenging his conviction, but he groups his five stated issues into two sections in his brief, wherein he makes two complaints—the trial court erred by not allowing his expert witness to testify, and the evidence is insufficient. As explained herein, we affirm.

---

[1] Section 49.09(b-2) provides that intoxication manslaughter is a first-degree felony if the evidence at trial shows that the defendant caused the death of a peace officer while that officer was "in the actual discharge of an official duty." *See* Tex. Penal Code Ann. §§ 49.08, 49.09(b-1)(2), (b-2).

2

Evidence at Trial

H.M.[2], a private security officer, testified that he was working the night shift at two locations near Highway 69 in Beaumont on the night of August 9, 2020. H.M. recalled that at about 2:25 a.m., he left one location to check on another location, had just taken the on-ramp onto Highway 69, and upon entering the northbound traffic lane he saw a vehicle headed toward him on the wrong side of the divided highway. H.M. explained that he took evasive action to avoid a collision by moving to the outside lane to avoid the oncoming car. According to H.M., the oncoming car passed him "rather quickly." H.M. agreed that when he gave a statement to the DPS, he stated the other car was traveling at approximately "60 to 70 miles per hour[.]"

Officer Gabriel Fells, a patrol officer with the Beaumont Police Department, testified that on August 9, 2020, he was on patrol with Officer Sheena Yarbrough. According to Fells, at about 2 a.m. that night, Yarbrough remembered that she had left her handcuffs at the Jefferson County jail on Highway 69, and the officers returned to the jail to pick them up. While at the jail, another officer said he had found an abandoned kitten for Yarbrough, and Yarbrough was excited to take the kitten because she had been wanting one. After leaving the jail, Fells and Yarbrough headed back to the Beaumont police department in downtown Beaumont to drop off

---

[2] We use initials to refer to witnesses who are not affiliated with law enforcement, EMS, the fire department, or the hospital.

their police vehicle and go home. Fells was driving on Highway 69, and he thought that all the traffic he saw coming toward him was on the other side of the highway. Fells recalled hearing his phone ring after the collision occurred, and he recalled listening to his voice on the 911 call from that night. Fells testified that, after the accident, he was pinned inside the police vehicle, his right arm would not work, he was in a lot of pain, and he could not reach Yarbrough. Fells agreed that their shift was over at 2:30 in the morning and that the kitten was on Yarbrough's lap "for a little bit." He also testified that neither he nor Yarbrough were wearing seat belts and that is because seat belts can get caught in the gear he wears and that they need to be able to get out of the patrol vehicle quickly. The recorded 911 call and video from the patrol vehicle and from Fells's body camera were admitted into evidence and played for the jury. When Officer Fells was recalled as a witness later during the trial, he testified that when he and Yarbrough were driving on Highway 69 back to Beaumont, they were still on duty, still on patrol, and still enforcing their duties.

Officer Bradley Martin, a patrol officer for the Beaumont Police Department testified that he was working the "fourth watch" with Officer Tassin on August 9, 2020, and that the fourth watch shift ends at 2:30 a.m. Martin testified that he and Tassin were at the jail that night where he saw Officers Fells and Yarbrough and that Yarbrough had decided to take home a stray cat that was found near the jail. According to Martin, he and Tassin left the jail shortly after Fells and Yarbrough,

4

and they received an alert about a wreck involving an officer. According to Martin, he and Tassin arrived at the scene at about 2:33 a.m., Fells's police vehicle was on the left side of the road, and the defendant's blue Mustang was on the other side of the highway. Martin testified that, even using tools, he was unable to open the driver's door of the police vehicle, and he punched through the windshield to try to gain access to Fells and Yarborough who were inside their patrol car. Martin testified that Yarbrough was pinned between the door and the dashboard, she was motionless, she had a lot of trauma to her head and face, and he did not detect any pulse nor signs of life from her. Martin also testified that it is common for police officers not to wear a seat belt so they can get out of the vehicle quickly, and in his opinion, a seat belt would not have helped Yarbrough.

Officer Daniel Bacciocchi testified that he responded to the crash, and Officers Martin and Tassin were at the scene when he arrived. Officer Bacciocchi saw that Fells's patrol vehicle had received extensive damage and a blue Mustang was on the other side of the road "facing the wrong way[.]" Bacciocchi testified that someone was still inside the Mustang, that person was "injured but conscious[,]" and he told Bacciocchi his name was Luis Torres. According to Bacciocchi, the police responding to the wreck could not open the doors to the patrol vehicle, and the dashboard was pushed up and had pinned Yarbrough against the door. Bacciocchi testified that firefighters used a mechanical device to cut Yarbrough out of the

5

vehicle. Bacciocchi testified that he saw the defendant's eyes, and they were "bloodshot and glassy and red[,]" and the defendant was uncooperative with EMS personnel. Video from Bacciocchi's body camera that night was admitted into evidence and played for the jury.

Officer Nelson Tassin, a patrol officer with the Beaumont Police Department, testified that he was working with Officer Martin on August 9, 2020. He recalled that, when he and Martin were at the county jail on Highway 69 that night, he found a kitten next to his patrol vehicle, he offered it to Officer Yarbrough, who was there with Officer Fells, and Yarbrough was happy to take the kitten. According to Tassin, he and Martin learned from dispatch that a major wreck had occurred, and they rushed to the scene where they saw that Fells's and Yarbrough's vehicle was badly damaged. When Tassin checked on Yarbrough, he could not find a pulse. Tassin checked on the driver of the other car, who said he was Luis Torres, but Torres did not say how the wreck happened. In Tassin's opinion, the kitten did not cause the collision, but rather a drunk driver driving on the wrong side of the highway caused the collision.

Trooper Steven Creader with the Department of Public Safety ("DPS") testified that he and Trooper Sanchez were dispatched to the scene of a major wreck involving a Beaumont Police Department patrol unit in the early morning hours of August 9, 2020. Creader testified that after the accident he marked the scene and

6

took pictures. According to Creader, the Mustang had severe damage on the front right side, the speedometer was locked on a speed just under 60 miles an hour, and that if a crash is severe enough, the speedometer will sometimes lock on the speed at the time of impact and show how fast the vehicle was going at the time of the collision. Creader also testified that, in his investigation at the crash site, he did not find any skid marks that indicated braking. He also determined that neither Fells nor Yarbrough were wearing seat belts, but he stated that sometimes law enforcement officers do not wear seat belts so they can get out of the vehicle quickly.

Creader testified that he determined that Luis Torres did not have a Texas driver's license, that the investigation showed Torres had consumed two margaritas at a restaurant that night, and that after leaving the restaurant, Torres bought a "12 pack of Lime-A Ritas and a 12 pack of White Claws." He also learned that Torres had gone to two parties that night. Creader testified that another trooper—Kasey Carrier—applied for a search warrant for the defendant's blood and Creader delivered the blood sample from Luis Torres to the DPS evidence locker at about 8 a.m. on August 9, 2020. Creader further testified that the investigation showed that Torres was driving while intoxicated and Torres caused the collision in which Yarbrough died, the cat had nothing to do with the collision, the collision was Torres's fault, and Fells and Yarbrough had no responsibility for the collision.

7

Travis Kirtley, an EMT for the Beaumont Fire Department, testified that he responded to a call of a motor vehicle accident near Lamar University on Highway 69 in the early morning hours of August 9, 2020. He testified that the police vehicle involved in the collision had "severe front end damage on the passenger front side[]" and he used the "Jaws of Life" to cut into the vehicle. Kirtley recalled that Fells was conscious, but Yarbrough was not moving. At some point, the firefighters determined that Officer Yarbrough was deceased.

James Posey testified that he is a firefighter for the Beaumont Fire Department and in the early morning hours of August 9, 2020, he responded to a call of a major accident near Lamar University. Posey described the damage on the passenger side of the police vehicle as "[h]eavy inclusion on the front passenger quarter panel." According to Posey, Fells was responsive and moving a little, but Yarbrough was unresponsive. Posey testified that the firefighters used multiple tools on the police vehicle, and they ended up peeling the roof back to get Yarbrough out.

Oliver Marion testified that he is an EMT for Beaumont EMS, and he responded to a call of a major accident about 2:40 a.m. on August 9, 2020. When Marion checked on Yarbrough, he found she was not breathing and did not have a pulse, and even after opening her airway, she did not take a breath. According to Marion, the driver of the other vehicle was lying on the ground screaming, "I just want to go home."

Kimberlee Perkins, a medic and EMT with Beaumont Fire & Rescue, testified that she and her partner responded to a call about a major accident involving a police officer in the early morning of August 9, 2020. Upon arrival, Perkins saw debris all over the road, a Beaumont patrol vehicle with heavy damage, and another vehicle on the right-hand side of the road that also had heavy damage. Perkins went to the civilian vehicle, and she identified the defendant as the driver of that vehicle. Perkins testified that the defendant had blood on his face, and he screamed whenever he tried to straighten his right leg. According to Perkins, the defendant was combative, was not following commands, could not answer questions initially, and he was consistently fighting the EMTs. Perkins testified that even after the EMTs got the defendant into the ambulance, he continued to be difficult, and he pulled off an IV and EKG leads. Perkins testified that the defendant did not ask about the condition of the officers in the other vehicle.

Alexandria Wright testified that she is a paramedic with the City of Beaumont, and she was called to a major accident in the early morning hours of August 9, 2020. Upon arrival, Wright saw a patrol vehicle with major damage to the passenger's side and another vehicle with major front-end damage. Wright testified that she treated the civilian at the scene, whom she identified as the defendant, and when the EMTs told the defendant he might have a broken leg and he needed to go to the hospital, he replied, "I need to go home. I need my mom. I need to go home." Wright testified

that the defendant was not cooperative, and his speech was slightly slurred. According to Wright, when she asked the defendant whether he had been drinking alcohol, he replied, "I'm not that drunk. I just want to go home."

Michelle Ceja testified that she works for the Beaumont Police Department as a crime scene technician where she takes pictures, records video, processes a scene for fingerprints, and collects evidence. She agreed she was called out to a location on Highway 69 on August 9, 2020, to take pictures, which were admitted as Exhibits 19 through 48, 50 through 59, 61, 62, 65, 67 through 71, 76, and 77. She agreed the photos show damage to both vehicles as well as some of Yarbrough's injuries.

Kasey Carrier, a trooper for DPS, testified that he has received training in standardized field sobriety testing. Carrier testified he received a call on August 9, 2020, about a trooper who needed assistance with a major crash involving a Beaumont police officer and requesting Carrier's help in getting a warrant for blood testing. Carrier prepared an affidavit for a search warrant to get a blood sample from Luis Torres, and he took the signed warrant to the hospital where Torres was being treated. Carrier testified that the affidavit supporting the search warrant stated that Torres had appeared confused or disoriented, was unable to adequately follow directions, and had difficulty with balance, and that Torres had told EMS personnel "that he is not that drunk[.]" A nurse drew a blood sample in Carrier's presence, and Carrier gave the sealed sample to Trooper Creader. According to Carrier, when he

was with the defendant at the hospital, he smelled an odor of alcohol. Carrier also testified that driving on the wrong side of the highway is very dangerous and suggests the driver is intoxicated. Later during the trial, Trooper Fransisco Rangel testified that he delivered the blood sample taken from the defendant to the DPS crime lab in Houston.

Ronnie Ann Hamilton testified she is a registered nurse who works at St. Elizabeth hospital in Beaumont. She testified that she treated the defendant at the hospital on August 9, 2020, and she drew two blood specimens from him that night. Hamilton thought Torres was drunk that night "[b]ecause he smelled like alcohol and he was slurring his words a little bit[,]" and a CAT scan revealed he had no head injury, so there was no reason for him to be slurring his words.

Dr. Ray Fernandez, a forensic pathologist in Beaumont, testified that he performed an autopsy of Officer Yarbrough, and his report was admitted into evidence. He determined that the cause of Yarbrough's death was blunt force head trauma, and the manner of death was accident. Dr. Fernandez testified that he observed Yarbrough to have "severe head trauma[]" as well as a scalp laceration; skull fractures; "scattered" abrasions and contusions; fractured ribs; a fractured arm, thumb, finger, and leg; and internal bleeding in her chest. Several autopsy photos were admitted into evidence. When asked whether it would have made a difference if Yarbrough had worn a seat belt, the doctor replied, "The amount of trauma that

11

the head has with crushing of the head, with a belt or without a belt, in my opinion, wouldn't have made a real difference[,]" and it was likely Yarbrough died upon impact.

Cheryl Szkudlarek testified that she is a forensic scientist with the DPS Crime Lab in Houston where she analyzes substances for alcohol concentration. Szkudlarek testified that she received the blood sample for Luis Torres and analyzed it using used headspace gas chromatography with flame ionization detection to determine whether alcohol was present. According to Szkudlarek, this methodology is regularly recognized as reliable throughout Texas. She testified that her analysis showed 0.209 grams of alcohol per 100 milliliters of blood, and the legal limit in Texas is 0.08. Szkudlarek testified that alcohol is a central nervous system depressant that can cause slowed reaction times, altered attention and control, memory loss, and diminished judgment.

Oscar Camarillo testified that he works for DPS where his duties include investigating crashes and enforcing criminal offenses. He also testified that he is fluent in Spanish, and he is certified as a translator. He recalled that on August 9, 2020, after an officer died in a collision, he was called to the hospital to meet with the defendant. He made a video recording of a conversation between the defendant and the defendant's parents, which was admitted as State's Exhibit 18 and played for the jury. Camarillo also testified that after recording the conversation, he

translated it, and his translation was admitted as State's Exhibit 18A. Camarillo testified that the defendant said to his parents, "I'm sorry," "You were right this whole time[,]" "I am sorry the lady died[,]" and "I know you told me so many times. I'm sorry for not listening." Camarillo testified that he thought that the defendant's parents had told him "over and over" not to drive drunk.

Camarillo also testified that he looked at the defendant's social media and found numerous things about his drinking. One was a video of the defendant at the restaurant with a margarita in front of him posted on the night of August 8, 2020 with a message that said, "[a]qui enviciandonos[,]" which Camarillo testified meant "[h]ere getting wasted." Another was a photo of the defendant drinking from a bottle of bourbon, with an empty bottle upside down in a cup, and another photo of the defendant pouring from a bottle with a message that said, "[c]uando me preguntan cuales son mis pasatiempos favorites[,]" which Camarillo testified meant "[w]hen they ask me how I spend my free time."

K.R. testified that she had a get-together on August 9, 2020, and she lived in an apartment in Nederland at the time. She agreed Torres showed up at her apartment at about 12:30 that night, he was underage, he had a beer, but he dropped it and the glass broke, and at one point, he sat on her flowerpot. K.R. was concerned about Torres leaving because he was drunk and she did not want him to drive, and she told him he could sleep on her couch. K.R. recalled she knew Torres had been drinking

13

before he arrived because he texted her best friend that he was drunk already. K.R. testified that her best friend told Torres he should not leave, but Torres said he had to work the next morning. According to K.R., her best friend was going to follow Torres home, but by the time he pulled his car around, Torres was gone.

Proffered Testimony of Dr. James Funk

The defense made a proffer of testimony from Dr. James Funk as an expert to testify about seat belt safety. The State asked for a hearing to determine what Funk's opinion would be, which the trial court granted, and a voir dire examination of Dr. Funk was conducted outside the presence of the jury.

Dr. Funk testified that he has a Ph.D. from the Automobile Safety Laboratory in mechanical engineering at the University of Virginia and he works for Biocore, LLC, an engineering consulting firm. Funk testified that accident reconstruction and biomechanics are his primary areas of expertise. In addition, Funk testified that he is licensed in biomedical and mechanical engineering in Texas and Virginia. According to Funk, he has been deemed an expert in biomechanical auto safety relative to the survivability of a crash. Funk explained that he had been involved in a study about the accuracy of black box data in vehicles and predicting the risk of being injured or killed in a frontal crash depending on the severity of the crash, whether the occupant was wearing a seat belt, and the age and gender of the occupant.

Funk understood that the collision occurred on a highway at speeds of 60 to 70 miles an hour, and with extensive damage due to a head-on collision. He also agreed that he had reviewed black box data from the police vehicle, dash cam videos, police reports and photographs, and the autopsy report for Officer Yarbrough.

On direct examination by the defense, Funk testified that a vehicle's black box provides information on the change in velocity or "delta-V"—"how much did the speed change in a crash[]"—which is a common measurement of the severity of a crash. Funk testified that the delta-V for the police vehicle was 46. Funk further testified that the risk to a young female occupant wearing a seat belt in a front-end collision with a delta-V of 46 was "actually very low[,]" and there was a "2 to 15 percent risk of fatality" for a belted occupant and the "risk is much higher for an unbelted occupant." In Funk's opinion, the crash was serious, but "it's a potentially survivable crash for a belted occupant, imminently survivable crash." Funk testified, "it's my opinion that she probably would have survived if she had been wearing her seat belt. There's no guarantee, but I think the probability is that she would have survived, probably would have been injured but survived."

On cross-examination by the State, Funk agreed that "[n]ot wearing a seat belt is not a problem if you're not in a crash." He also agreed that if the defendant had not been drunk and driving the wrong way down the highway, Officer Yarbrough would still be alive. Funk testified that not wearing a seat belt was a "factor" in

15

Yarbrough's death, and he agreed that Yarbrough would not have died just for not wearing a seat belt and the defendant's actions were required to cause her death.

The trial court also questioned Dr. Funk, and Funk admitted he did not know the defendant's speed at the time of impact, and he did not know that the defendant did not have a driver's license. Funk also agreed that wearing a seat belt reduces the risk of fatality by 30 to 94 percent, but it does not reduce the risk by 100 percent and that "[o]bviously there's no guarantee of survival even with a seat belt." Funk agreed with the court's reading of his report that "even looking at it for the best light possible, the defendant's actions were, according to your findings, at least 6 percent up to almost 39 percent the cause of her fatality[.]"

The State objected to Dr. Funk's testimony because it conflicted with section 6.04 of the Penal Code on causation and because his testimony would confuse the jury. The court denied the admission of Dr. Funk's testimony, explaining as follows:

> [Section] 6.04 [of the Penal Code] shows one of two things from the evidence so far, that either defendant is solely responsible for the result and the circumstances as alleged in this indictment or is of significant concurrent responsibility. And by law that fits within the four corners of Rule 6.04 for its issue. And when it is that clear, the responsibility still rests with -- at the end rests with the defendant when the circumstances and evidence shows but for his conduct, whatever percentage, as long as it's clearly sufficient to cause is -- equals responsibility under the law.

The defense then rested. The jury found Torres guilty as charged in the indictment, and after a hearing on punishment, the jury assessed punishment at 20 years of imprisonment.

After entry of judgment, the trial court sua sponte signed "Post-Judgment Findings of Fact and Conclusions of Law Regarding the Exclusion of Testimony From the Proffered Defense Expert James R. Funk Before the Jury During the Guilt Phase of Trial." The Findings of Fact and Conclusions of Law stated, in relevant part:

> . . . Dr. James R. Funk was prepared to testify that defendant's actions were responsible for the injuries sustained by decedent in the collision as being in a quantifiable range from between 6% to just under 40%. Upon questioning by the State, the expert admitted that the collision would not have occurred but for defendant driving the wrong way on a divided highway. The expert opined that the driver of the vehicle in which the decedent passenger was killed was somewhat at fault for failing to avoid the head on collision . . . despite the fact that defendant was driving the wrong way on a divided highway in darkness. The expert also faulted the decedent for not wearing her seatbelt at the time of the collision. He further opined that decedent may have survived had she been wearing a seatbelt.
> . . .
> [] This question before the Court regarding gatekeeper admissibility of the expert witness hinged on causation and concurrent causation.
> . . .
> [] In *Jordan v. State*, 928 S.W.2d 550, 553-54 n.4 (Tex. Crim. App. 1996), the CCA discussed the "relevance" prong of the gatekeeping analysis as the closeness of the "fit" between the scientific evidence and the fact to which it is offered. "Whether evidence 'will assist the trier of fact' and is sufficiently tied to the facts of the case is a simpler, more straight-forward matter to establish than whether the evidence is sufficiently grounded in science to be reliable." *Id.* at 555;

17

*see also Hartman* [*v. State*], 946 S.W.3d [60,] 62-63 [(Tex. Crim. App. 1997)].

[] Pursuant to the foregoing proffered testimony, section 6.04 of the [P]enal [C]ode, and this Court's exercise of the *Daubert*/*Kelly* gatekeeping function, this Court ultimately concluded that the testimony would not be helpful to the jury, and in fact could be deemed confusing, for the simple fact that even considered in the best light, the testimony would not have helped defendant. The expert could not exclude defendant as a "but for" cause of the collision, or testify that "the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient," which would be required for his testimony to be legally relevant under section 6.04(a) of the Penal Code. Even with defendant's causal connection in the 6% to just under 40% range as opined by [Dr. Funk], defendant would still be legally responsible under Penal Code § 6.04. In other words, failure to wear a seatbelt or to avoid a wrong way crash on a one way divided highway, do not amount to superseding intervening causes abrogating defendant's responsibility for the collision.

. . .

Based on the foregoing, this Court concluded at trial that the defense had not proffered an expert that would be helpful to explain the issue of causation because it did not meet the threshold of section 6.04(a), and would in fact, tend to confuse the jury. Therefore, under the gatekeeping principles of *Merrill Dow*, *Kelly*, and their progeny, this Court excluded the testimony.

Torres timely filed his notice of appeal.

## Issues

In his first section of his brief, Appellant argues that the trial court erred by not allowing his expert witness to present rebuttal testimony on causation. According to Appellant, his expert, Dr. Funk, would have testified that the officers were distracted and failed to notice or avoid Torres's vehicle and that the officers' failure to wear seatbelts "made it statistically probable that [if they had been wearing their

18

seatbelts] both officers would have survived the crash." Appellant argues that the trial court erred by concluding Dr. Funk's testimony would not be helpful to the jury, would be confusing, and would not have helped Appellant, and that such errors were "incorrect and were an abuse of discretion." Appellant also argues that Dr. Funk's testimony would have been both material and favorable to his defense, and the failure to allow the doctor's testimony "preemptively determined a fact question" that should have been determined by the jury. According to Appellant, the denial of Dr. Funk's rebuttal testimony was arbitrary, unfair, prejudicial, and harmful error because Appellant was denied the right to rebut issues raised by the State. Appellant also argues that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the trial court excluded his expert's testimony.

In the second section of his brief, Appellant challenges the sufficiency of the evidence to support his conviction. According to Appellant, the State failed to prove beyond a reasonable doubt that, when the collision occurred, Officers Fells and Yarbrough were in the actual discharge of an official duty, as required by section 49.09(b-1) and (b-2) of the Penal Code. Appellant argues that the officers were either off-duty because their watch (or shift) had ended at the time the collision occurred, or because they were on a "frolic and detour outside of their official duties[]" and, therefore, Appellant should not have been charged with an enhanced first-degree offense under section 49.09 but rather as second-degree intoxication manslaughter

19

under section 49.08.[3] In addition, Appellant argues that the officers could have avoided a collision, or could have mitigated the effects of a collision, except that (1) they were playing with a kitten and not paying attention to the road and (2) Officer Fells testified that neither he nor Officer Yarbrough were wearing seat belts.

Appellant asks this Court to reverse the judgment of conviction and enter a judgment of acquittal, or in the alternative, to reverse the judgment and remand for a new trial.

Exclusion of Alleged Expert Testimony

We review a trial court's ruling on the admission or exclusion of evidence under an abuse of discretion standard of review. *Colone v. State*, 573 S.W.3d 249, 263-64 (Tex. Crim. App. 2019). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *De La Paz v.*

---

[3] The Court of Criminal Appeals has explained that under section 49.09(b-2), "an offense under section 49.08 (intoxication manslaughter) is a second-degree felony[,] [b]ut if the decedent was a peace officer who was discharging an official duty at the time of the offense, it is a first-degree felony." *Briggs v. State*, 560 S.W.3d 176, 179 n.7 (Tex. Crim. App. 2018) (citing Tex. Penal Code Ann. §§ 49.08, 49.09(b-2)).

*State*, 279 S.W.3d 336, 343-44 (Tex. Crim. App. 2009) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)); *State v. Mechler*, 153 S.W.3d 435, 439-40 (Tex. Crim. App. 2005). If the trial court's decision is correct on any theory of law applicable to the case, we will uphold the decision. *De La Paz*, 279 S.W.3d at 344; *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002). The erroneous admission or exclusion of evidence is generally reviewed under the standard for non-constitutional error contained in Rule 44.2(b) of the Texas Rules of Appellate Procedure if the trial court's ruling merely offends the rules of evidence. *See Walters v. State*, 247 S.W.3d 204, 218-19 (Tex. Crim. App. 2007); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001).

Evidence is relevant if it has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018) (citing Tex. R. Evid. 401). Relevant evidence is generally admissible. *See* Tex. R. Evid. 402; *Gonzalez*, 544 S.W.3d at 370. Even if the evidence is relevant, a trial court may determine that it is not admissible for other reasons, including exclusion under evidentiary Rule 403. *See* Tex. R. Evid. 403.

In considering whether to admit expert testimony, a trial court acts as a gatekeeper and makes a threshold determination whether the testimony "will help the trier of fact understand the evidence or determine a fact in issue." *Kelly v. State*,

21

824 S.W.2d 568, 572 (Tex. Crim. App. 1992); *see also* Tex. R. Evid. 702 (requiring that expert testimony help the factfinder to understand the evidence or to determine a fact issue); *Somers v. State*, 368 S.W.3d 528, 536 (Tex. Crim. App. 2012). A trial court also must determine whether the expert's opinion is reliable—whether it is based on a valid scientific theory and a technique that is valid and properly applied. *See Kelly*, 824 S.W.2d at 573. Even if the court determines that an expert's testimony is reliable, the court must also apply Rule 403 to determine whether the expert's testimony might be unhelpful to the factfinder—for example, because it is merely cumulative, would tend to confuse or mislead the jury, or because it would consume an inordinate amount of time at trial. *See id.* at 572 (citing Tex. R. Evid. 403).

Section 6.04(a) of the Penal Code addresses causation in a criminal case and states, "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." *See* Tex. Penal Code Ann. § 6.04(a). If there are concurrent causes, the but-for requirement can be satisfied if (1) the defendant's conduct alone was clearly sufficient to cause the harm, or (2) the defendant's conduct and the other cause together were sufficient to cause the harm. *See Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986). The defendant is not criminally responsible if the other alleged cause (here, Yarbrough's failure to wear

a seat belt) alone was clearly sufficient to cause the resulting harm *and* the defendant's conduct by itself was clearly insufficient to cause the resulting harm. *Id.*; *see also* Tex. Penal Code Ann. § 6.04(a).

At trial, the defense announced its intention to call Dr. James Funk as an expert witness on seat belt safety. In the proffer made of Funk's testimony, Funk testified in his voir dire examination outside the presence of the jury that, in his opinion, and based on his own studies as well as other automobile safety data, the collision was "potentially survivable [] for a belted occupant" and that Yarbrough "probably would have survived if she had been wearing her seat belt." Funk also testified that "[n]ot wearing a seat belt is not a problem if you're not in a crash[]" and that Yarbrough not wearing a seat belt would not have caused Yarborough's death without the defendant's conduct in causing the collision. Funk also agreed that the defendant caused the collision. When the court questioned Funk, Funk testified that "[o]bviously there's no guarantee of survival even with a seat belt."

The State objected to Funk's testimony because it conflicted with section 6.04 of the Penal Code (addressing causation in a criminal matter) and because his testimony would confuse the jury. In granting the State's motion to exclude Funk's testimony, the trial court explained that "6.04 shows one of two things from the evidence so far, that either defendant is solely responsible for the result and the

23

circumstances as alleged in this indictment or is of significant concurrent responsibility."

In this case, the trial court excluded Funk's testimony not because it was not reliable under *Kelly* but rather because his testimony would not "be helpful to explain the issue of causation because it did not meet the threshold of section 6.04(a), and would in fact, tend to confuse the jury." As the trial court explained in its Findings of Fact and Conclusions of Law, Dr. Funk could not exclude the defendant as a "but for" cause of the collision, nor could he testify that Yarbrough's failure to wear a seat belt was clearly sufficient to produce the result *and* that the defendant's conduct was clearly insufficient to produce the result—both of which are required by section 6.04 of the Penal Code. *See* Tex. Penal Code Ann. § 6.04. Even though Dr. Funk would have testified that wearing a seat belt would have reduced the risk of fatality to Yarbrough by 30 to 94 percent, he could not testify that Officer Yarbrough's failure to wear a seat belt *by itself* would have caused the collision or caused her death. Therefore, it was within the trial court's discretion to exclude Dr. Funk's testimony from the jury because it does not relieve Torres of his responsibility under the Penal Code for causing Yarbrough's death. Stated another way, we agree with the trial court that his testimony would not have been helpful to the jury in determining causation under Penal Code section 6.04 and agree with the trial court

24

that if admitted, it could have confused the jury. *See* Tex. R. Evid. 403, 702; Tex. Penal Code Ann. § 6.04; *Kelly*, 824 S.W.2d at 572-73.

As to Appellant's arguments on appeal that the exclusion of Dr. Funk's testimony violated Appellant's constitutional rights, we conclude that Appellant failed to preserve these arguments for appeal. *See* Tex. R. App. P. 33.1(a) (to preserve error for appeal, a party must make the challenge to the trial court and obtain an adverse ruling thereon). The record reflects that the State had rested its case-in-chief before the proffer of Dr. Funk's testimony. The record neither shows that Torres argued to the trial court that Dr. Funk should be allowed to testify as a rebuttal witness, nor did Torres argue that the exclusion of Dr. Funk's testimony violated Torres' constitutional rights. Even claims alleging constitutional errors may be waived by a defendant's failure to raise the objection in his trial. *See Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (concluding that the failure to object at trial waived a federal constitutional due-process claim). Appellant does not argue that his objections are exempt from the rules of error preservation. *See Saldano v. State*, 70 S.W.3d 873, 886-87 (Tex. Crim. App. 2002) (explaining that error preservation rules apply even to constitutional challenges except for two categories of errors not applicable here). Because Appellant failed to raise his constitutional objections at trial, we may not consider them now. *See id.*; *Broxton*, 909 S.W.2d at

25

918; *see also* Tex. R. App. P. 33.1. We overrule the issues raised in Appellant's first section of his brief.

Sufficiency of the Evidence

A person commits the offense of intoxication manslaughter if that person (1) operates a motor vehicle in a public place, (2) while intoxicated, and (3) by reason of that intoxication, causes the death of another person by accident or mistake. *See* Tex. Penal Code Ann. § 49.08(a); *Wooten v. State*, 267 S.W.3d 289, 294-95 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). Appellant does not challenge the sufficiency of the evidence on these elements, but he does challenge the enhancement under section 49.09(b-2) for causing the death of a police officer while that officer was "in the actual discharge of an official duty." *See* Tex. Penal Code Ann. § 49.09(b-1)(2), (b-2) (if the decedent is a police officer in the actual discharge of an official duty, the offense is a first-degree felony).

In reviewing the legal sufficiency of the evidence to support a conviction, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Metcalf v. State*, 597 S.W.3d 847, 865 (Tex. Crim. App. 2020) (citing *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995)). The appellate court does not reweigh the evidence or determine the credibility of the evidence, nor does it substitute its own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). "Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13).

Although Appellant challenges the sufficiency of the evidence to support his conviction, he does so only as to sufficiency of the evidence of causation, and he asserts that the officers could have avoided the collision or mitigated its effects if they had been wearing seat belts and did not have a cat inside the vehicle with them at the time of the collision. In addition, he argues that the evidence is not sufficient

27

to establish that Yarbrough died while in the actual discharge of her official duties. Appellant does not challenge that he was intoxicated, that he was driving the wrong way on the highway, that he collided with the vehicle that Fells was driving and in which Yarbrough was a passenger, so we do not review the sufficiency of the evidence on those elements. *See* Tex. R. App. P. 47.1.

Alleged Concurrent Causation

Appellant argues that the evidence failed to establish "appropriate causation[]" because neither Fells nor Yarbrough were wearing seatbelts, and he claims "[t]hey were paying attention to a kitten, not the highway." Appellant also argues that "[t]here was insufficient evidence to defeat concurrent causation." According to Appellant, "[f]or at least ten seconds, they could have avoided or mitigated a collision."

As previously stated, section 6.04(a) of the Penal Code states, "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor [was] clearly insufficient." *See* Tex. Penal Code Ann. § 6.04(a). This section was included as an instruction in the jury charge. "Where two or more causes satisfy 'but for' causation, a criminal defendant remains liable if [his] conduct was either sufficient to have caused the result alone 'regardless of the existence of a concurrent cause,'

28

or both causes '*together*' were sufficient to cause the result." *Cyr v. State*, 665 S.W.3d 551, 557 (Tex. Crim. App. 2022) (quoting *Robbins*, 717 S.W.2d at 351). If an additional cause, other than the defendant's conduct is clearly sufficient by itself to produce the result, and the defendant's conduct by itself is clearly insufficient, then the defendant cannot be convicted. *See Wooten*, 267 S.W.3d at 296 (citing *Robbins*, 717 S.W.2d at 351). To prove intoxication manslaughter, the State had to prove that Appellant drove while intoxicated and, "by reason of that intoxication cause[d] the death of another by accident or mistake[:]" The State did not have to prove that Appellant's intoxication was the sole cause of the fatal collision. *See* Tex. Penal Code Ann. § 49.08(a)(2); *see also Leleo v. State*, Nos. 01-20-00034-CR, 01-20-00035-CR, 2022 Tex. App. LEXIS 614, at *69 (Tex. App.—Houston [1st Dist.] Jan. 27, 2022, no pet.) (mem. op., not designated for publication).

The undisputed evidence reflects that Torres did not have a driver's license, that Torres's blood alcohol concentration was 0.209 grams per 100 milliliters and in excess of the legal limit in Texas of 0.08, and Torres was driving the wrong way on a divided highway at about 60 miles an hour. Both vehicles sustained extensive front-end damage. The evidence reflects that Fells and Yarbrough were not wearing their seat belts. That said, even assuming without deciding that the failure to wear seat belts was a concurrent cause of Officer Yarbrough's death, Appellant cites no evidence that the officers' failure to wear their seat belts was clearly sufficient *on its*

*own* to cause Yarbrough's death. *See id.* In other words, there is no evidence that (1) the additional alleged cause of failure to wear seat belts was clearly sufficient, by itself, to produce the resultant collision and Yarbrough's death *and* (2) that Torres's conduct, by itself, was clearly insufficient. *See Robbins*, 717 S.W.2d at 351; *see also Leleo*, 2022 Tex. App. LEXIS 614, at *71 (concluding that a reasonable jury could conclude that the victim's death would not have occurred but for the appellant's driving while intoxicated, "operating either alone or concurrently with another cause[]" where there was some evidence that the victim had run a stop sign and failed to yield the right of way); *Wooten*, 267 S.W.3d at 295-97 (concluding that when the defendant, an intoxicated driver, alleged that other road conditions caused the fatal accident, "even if other factors contributed in some way to the accident, these factors were not clearly sufficient to cause the fatalities in this case[]").

Appellant also alleges that Officers Fells and Yarbrough could have avoided the collision because "[t]hey were paying attention to a kitten, not a highway." Fells testified that, when he and Yarbrough returned to the county jail to pick up Yarbrough's handcuffs, Yarbrough took a kitten that another officer had found and that the kitten sat in Yarbrough's lap "for a little bit." Appellant's record references do not support his assertion that Officer Fells was paying attention to the kitten when the collision occurred nor that the kitten otherwise caused the collision. *See* Tex. R. App. P. 38.1(i) (an appellate brief must contain appropriate citations to authority and

30

to the record). In other words, there is no evidence that (1) the additional alleged attention to the kitten rather than the roadway was clearly sufficient, by itself, to produce the resultant collision and Yarbrough's death *and* (2) that Torres's conduct, by itself, was clearly insufficient. *See Robbins*, 717 S.W.2d at 351. Accordingly, we overrule these arguments.

Actual Discharge of an Official Duty

We next address Appellant's argument that the State failed to prove beyond a reasonable doubt that Officers Fells and Yarbrough were in the actual discharge of an official duty when the collision occurred. According to Appellant, because the collision occurred after 2:30 a.m., when the fourth watch ended, Fells and Yarbrough were not in the actual discharge of their official duties, and Appellant should not have been charged with the enhanced offense under section 49.09(b-1)(2), (b-2).

Intoxication manslaughter is a second-degree felony, but it can be a first-degree felony if the defendant caused the death of a peace officer while that officer "was in the actual discharge of an official duty." *See* Tex. Penal Code Ann. §§ 49.08(b), 49.09(b-1)(2), (b-2). The statute does not define "in the actual discharge of an official duty." *See id.* § 49.09(b-1)(2). When reviewing the sufficiency of the evidence, "undefined statutory terms 'are to be understood as ordinary usage allows, and jurors may [] freely read statutory language to have any meaning which is acceptable in common parlance.'" *Dunham v. State*, 666 S.W.3d 477, 484 (Tex.

Crim. App. 2023) (citing and quoting *Clinton v. State*, 354 S.W.3d 795, 800 (Tex.

Crim. App. 2011); *Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992)).

Appellant cites no cases defining "actual discharge of an official duty." In

*Hall v. State*, 158 S.W.3d 470 (Tex. Crim. App. 2005), the Court of Criminal

Appeals reviewed a conviction for assault on a public servant. The Court explained:

> This Court has addressed the general issue of a police officer's "lawful
> discharge" of official duties as it relates to a lesser-included charge on
> several occasions. In doing so, we have repeatedly stated that "as long
> as the officer was acting within his capacity as a peace officer, he was
> acting within the lawful discharge of his official duties." In particular,
> we have looked at the details of the encounter, such as whether the police
> officer was in uniform, on duty, and whether he was on regular patrol at
> the time of the assault. . . . As we have concluded in those cases, the
> "lawful discharge" of official duties in this context, does not mean that
> the officer has crossed every "t" and dotted every "I" of every duty that
> relates to his public office.

*Hall*, 158 S.W.3d at 474 (citations omitted). The Court further stated that "the

'lawful discharge' of official duties in this context means that the public servant is

not criminally or tortiously abusing his office as a public servant[.]" *Id.* at 475. In

*Cuevas v. State*, the Court held that a peace officer who enforces Texas law while

working as a private security guard is lawfully discharging an official duty. *See* 576

S.W.3d 398, 399-400 (Tex. Crim. App. 2019) (a county constable who was

moonlighting as a security guard at a private function was "discharging an official

duty" when he enforced section 28.10(b) of the Texas Alcoholic Beverages Code by

prohibiting a guest from taking alcohol outside the premises). And in another case

32

reviewing a conviction under section 19.03 of the Penal Code for the capital murder of a police officer, the Court stated, "A police officer is acting within the lawful discharge of his official duties under the statute so long as he is 'on duty, in uniform[.]'" *Ruiz v. State*, No. AP-75,968, 2011 Tex. Crim. App. Unpub. LEXIS 137, at *10 (Tex. Crim. App. Mar. 2, 2011) (not designated for publication) (citing *Guerra v. State*, 771 S.W.2d 453, 461 (Tex. Crim. App. 1988)).

In *Ivey v. State*, No. 01-15-00804-CR, 2017 Tex. App. LEXIS 7465 (Tex. App.—Houston [1st Dist.] Aug. 8, 2017, pet. ref'd) (mem. op., not designated for publication), the Houston First Court affirmed the appellant's conviction of intoxication manslaughter of a peace officer where the officer was killed in a head-on collision "[w]hile driving his Harris County Sheriff's Department vehicle[.]" In *Willemsen v. State*, No. 14-17-00781-CR, 2019 Tex. App. LEXIS 7509 (Tex. App.—Houston [14th Dist.] Aug. 22, 2019, no pet.) (mem. op., not designated for publication), the Houston Fourteenth Court affirmed the appellant's conviction of intoxication manslaughter of a peace officer where the officer died from injuries sustained when a car appellant drove collided with the officer's patrol car. The Tenth Court upheld a conviction for aggravated assault of a public servant in part because the victim was a sergeant with the sheriff's department who was in a marked patrol vehicle and dressed in uniform. *See Sneed v. State*, No. 10-14-00207-CR, 2015 Tex.

App. LEXIS 4703, at *5, *10 (Tex. App.—Waco May 7, 2015, pet. ref'd) (mem. op., not designated for publication).

Appellant argues that, because their shift ended at 2:30 a.m., Fells and Yarbrough should not be considered to have been in the actual discharge of an official duty under section 49.09 of the Penal Code. Appellant argues that "the officers were off-duty, or, at a minimum, on a frolic and detour outside of their official duties."[4] At trial, Fells testified that after leaving the county jail, "I was going back to the Beaumont Police Department to drop off the unit and go home." Fells testified that the shift he and Yarbrough were working that night ran from 4 p.m. to 2:30 a.m., but technically they were on duty until they turned in their patrol vehicle.

> [Prosecutor]: Y'all went to the jail. At the time of the incident when y'all are leaving the jail, y'all are still on patrol at that particular time; is that correct?
>
> [Fells]: I mean, yeah, technically. The watch had been called but, I mean, we're on patrol until that unit's turned in.
>
> [Prosecutor]: If there had been a call come in, you would have responded to it?

---

[4] Generally, a "frolic" is an employee's activity during working hours that is not within the scope of employment, and a "detour" is a deviation from travel on an assigned route that is still within the scope of employment. *See* Restatement (Third) of Agency § 7.07 cmt. e. These concepts may be used to determine tort liability, that is, in the context of whether an employer (or principal) is liable for an employee's (or agent's) conduct. *See id.* § 7.07 (Employee Acting Within Scope of Employment). Appellant has not explained how these concepts apply in the context of criminal liability under the criminal statute at issue, and we decline the invitation to apply these civil tort concepts in this criminal case.

34

[Fells]: Yes, sir.

[Prosecutor]: Okay. All right. And until you're out of that car until you get into your own personal car, you're on call; is that correct?
[Fells]: Yes, sir.

Photos taken at the scene of the collision show that Yarbrough was still in uniform.

Trooper Creader testified that the collision occurred at 2:31 a.m. Officer Martin testified that he and his partner, Officer Tassin, responded to a call about the collision, and it was 2:33 a.m. when they arrived at the scene. EMT Oliver Marion testified that he received a call about the collision at about 2:39 or 2:40 a.m. The undisputed evidence shows that Fells and Yarbrough were still in uniform, they were returning from the county jail and on their way to turn in the police vehicle at the police department in downtown Beaumont, they were on patrol until the police vehicle was turned in, and they would have responded if a call had come in. Considering the facts and circumstances of the incident, we conclude that there was sufficient evidence from which the jury could have reasonably concluded that Yarbrough died as a result of the collision that occurred while she was "in the actual discharge of an official duty." *See* Tex. Penal Code Ann. § 49.09(b-1)(2), (b-2); *Cuevas*, 576 S.W.3d at 399-400; *Hall*, 158 S.W.3d at 474.

Construing the record evidence in a light most favorable to the verdict, we conclude that the evidence is sufficient to support the jury's verdict. *See Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 13. We overrule all of the issues raised in

35

Appellant's second part of his brief. Having overruled all of Appellant's issues, we affirm the judgment of conviction.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on July 17, 2023
Opinion Delivered October 11, 2023
Do Not Publish

Before Golemon, C.J., Horton and Johnson, JJ.